NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JOHN SANDERS, et al., *Plaintiffs/Appellants*,

*v.*

SPRINGFIELD COMMUNITY ASSOCIATION, *Defendant/Appellee*.

No. 1 CA-CV 21-0494
FILED 5-23-2023

Appeal from the Superior Court in Maricopa County
No. CV2019-096071
The Honorable Tracey Westerhausen, Judge

**AFFIRMED**

COUNSEL

Christopher D. Hill Attorney at Law, Tucson
By Christopher D. Hill
*Counsel for Plaintiffs/Appellants*

Dean R. Cox, L.L.C., Prescott
By Dean R. Cox
*Counsel for Defendant/Appellee*

_____

**MEMORANDUM DECISION**

Presiding Judge Maria Elena Cruz delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Michael J. Brown joined.

_____

**C R U Z**, Judge:

**¶1**        Plaintiffs John Sanders, Robert Sanders, and Lori Venberg appeal the superior court's order granting summary judgment in favor of defendant Springfield Community Association ("SCA"). For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

**¶2**        In January 2018, Coeta Sanders was walking within a retirement community owned by SCA, when she tripped over a raised portion of a sidewalk and fell. Coeta suffered severe injuries, including a broken wrist, skull fracture, and internal bleeding in her brain. Coeta required multiple surgeries, as well as intensive rehabilitation and a feeding tube for several months. She still requires assistance in most of her daily functions and activities.

**¶3**        Coeta, her husband (John Sanders), and her adult children (Robert Sanders and Lori Venberg) pursued settlement of liability claims with SCA's property liability insurer. After months of settlement discussions and negotiations between counsel for the Sanders family and counsel for SCA, the parties finally came to an agreement. Counsel for SCA emailed counsel for the Sanders family advising that the offer to settle was for $350,000 inclusive of all liens. The next day, counsel for the Sanders family responded, also via email, that Coeta, John, Robert, and Lori agreed to settle their claims for $350,000, inclusive of all medical liens. In that same email, counsel for the Sanders family directed SCA's counsel to prepare a written release for their review.

**¶4**        SCA's counsel drafted the release agreement, but only included Coeta's name on the agreement. The agreement also accidentally identified Coeta as "a single woman." The agreement stated Coeta agreed to release her claims against SCA and its liability carrier for a total sum of $350,000, with $200,000 paid to Coeta and $150,000 paid directly to the medical lien holder. Counsel for the Sanders family made several revisions,

which included identifying Coeta as married. However, counsel for the Sanders family made no mention of the omission of John, Robert, and Lori from the written agreement. Coeta signed the release agreement, and she received a check for $200,000 shortly thereafter.

¶5         About five months later, counsel for the Sanders family sent another demand and settlement offer to SCA's counsel. Counsel for the Sanders family indicated that the release only included Coeta's claims, and he made an offer to settle the loss of consortium claims for John and Lori for a total of $150,000. SCA's counsel responded that all members of the Sanders family agreed to the previous settlement of $350,000, and he sent a revised release agreement that included the names of John, Robert, and Lori. SCA's counsel indicated that if the Sanders family did not sign it, he would file a lawsuit to enforce the settlement agreement.

¶6         Counsel for the Sanders family responded that his clients would not sign the revised release. Admitting all four of his clients agreed to settle their claims for $350,000, counsel for the Sanders family stated the written agreement was a counteroffer because it contained varied terms from their oral agreement. Counsel claimed the parties originally agreed that the Sanders family was to be directly paid the entirety of the $350,000, and they would be responsible for paying the lienholder. However, the written agreement directed that SCA was to directly pay the lien holder. SCA's counsel again indicated he would file suit to enforce the settlement agreement if the revised release was not signed.

¶7         John, Robert, and Lori then filed this case alleging loss of consortium claims against SCA. SCA moved to dismiss for failure to state a claim upon which relief can be granted, and also sought sanctions. SCA asserted the parties had already settled their loss of consortium claims and the emails between counsel constituted a written agreement that bound John, Robert, and Lori. *See* Ariz. R. Civ. P. ("Rule") 80(a) ("If disputed, no agreement or consent between parties or attorneys in any matter is binding, unless: (1) it is in writing; or (2) it is made orally in open court and entered in the minutes."). SCA argued in the alternative that because Coeta had settled her claims, the loss of consortium claims by her husband and children were extinguished.

¶8         John, Robert, and Lori opposed the motion to dismiss and filed a cross-motion for summary judgment, arguing they had not settled or released their claims against SCA.

3

**¶9** In its ruling made after further briefing and oral argument, the court noted that SCA relied on the release agreement and other correspondence in its motion to dismiss, and because those matters were outside the four corners of the complaint, the court was required to treat the motion as a motion for summary judgment. *See* Rule 12(b), (d). The court granted SCA's motion, finding the loss of consortium claims were derivative of Coeta's claims and accordingly extinguished.[1] John, Robert, and Lori unsuccessfully moved for new trial, arguing the claims were not extinguished.

**¶10** John, Robert, and Lori timely appealed. Although SCA raised the issue of unilateral mistake, the superior court did not rule on the legal consequences of the unilateral mistake. Accordingly, we stayed the appeal and remanded to the superior court to determine whether sufficient evidence supported reformation of the settlement agreement.

**¶11** On remand, based on the filings provided to it, the superior court found by clear, convincing and satisfactory proof that:

> 1. The parties intended to resolve all claims, including those of Plaintiffs in this action via the terms of the settlement;
>
> 2. Counsel for Plaintiffs was aware of the error in the release document and took advantage of the unilateral mistake of Defendant's counsel;
>
> 3. The actions of Plaintiffs' counsel in taking advantage of what he knew at the time to be a unilateral mistake on the part of Defendant's counsel in drafting the agreement of the parties constitutes inequitable conduct which justifies reformation of the contract to include the release of Plaintiffs' claims as part of the settlement agreement.

We have jurisdiction pursuant to Arizona Revised Statutes section 12-2101(A)(1), (5)(a).

---

[1] Although initially agreeing that the correspondence constituted a settlement under Rule 80(a), the court later vacated that ruling in granting in part a motion for new trial filed by John, Robert, and Lori.

**DISCUSSION**

¶12 Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a). We review the grant of summary judgment de novo. *Jackson v. Eagle KMC L.L.C.*, 245 Ariz. 544, 545, ¶ 7 (2019). We may uphold the court's ruling if it is correct for any reason supported by the record. *Leflet v. Redwood Fire & Cas. Ins. Co.*, 226 Ariz. 297, 300, ¶ 12 (App. 2011).

I.      Unilateral Mistake and Reformation

¶13 "A clear and unambiguous contract must be interpreted according to its terms. Unless there is fraud, misrepresentation or mistake, those manifestations of assent are to be gleaned from within the four corners of the contract, not from parol evidence." *Isaak v. Mass. Indem. Life Ins. Co.*, 127 Ariz. 581, 584 (1981) (citations omitted).

¶14 SCA seeks to reform the written agreement to include the names of John, Robert, and Lori, arguing their omission was unintentional and a mistake. In order "to reform an instrument because of the unilateral mistake of one party, there must be fraud or inequitable conduct by the other party." *Id.* Inequitable conduct which would justify reformation is knowledge on the part of one party of the other's mistake. *Id.* Here, counsel for the Sanders family was aware SCA had omitted John, Robert, and Lori from the written agreement, even though the parties had agreed to bind all four family members to the $350,000 settlement.

¶15 Counsel for the Sanders family does not deny that the parties initially agreed to settle all claims for $350,000, but contends the final written contract was materially different from their initial agreement. Sanders family's counsel claims that, during a phone call, the parties had agreed that the entire $350,000 would be paid directly to the Sanders, and the Sanders would be responsible for paying the lienholder. The written contract, however, directs SCA to pay only $200,000 and to directly pay the lienholder the negotiated recovery of $150,000. Accordingly, counsel for the Sanders family claims that he believed the omission of John, Robert, and Lori from the written agreement was an intentional counteroffer.

¶16 The email to counsel for the Sanders family from SCA's counsel states:

> As I explained to you last Wednesday, this matter has been transferred to me for all purposes and you are to be

communicating with me. I also explained the $350,000.00 offer to settle would expire one week from . . . that conversation, which is this Wednesday, May 12th, 2019. That offer to settle is inclusive of all liens which must be satisfied as part of the settlement. Please contact me if you wish to discuss this further.

Sanders family counsel responded, "The Sanders have instructed me to communicate their agreement to settle their claims in this matter for $350,000 inclusive of all liens, *as you have specified below.*" (Emphasis added.)

¶17 As evidenced by the emails, the Sanders family agreed to settle their claims for $350,000, and the only specification of this settlement offer was that the $350,000 included all liens. The written settlement contract was consistent with this agreement. There is no indication the agreement of the settlement was contingent upon direct payment of the entire sum to counsel, and even if discussed over the phone, which party is responsible for paying the lienholder is not so material that the written contract could be construed as a counteroffer. SCA's direct payment to the lienholder does not preclude the Sanders from continuing to dispute and negotiate the lienholder's demand, and counsel admits there is currently an administrative appeal with the lienholder regarding the recovery amount.

¶18 Emails between the parties indicate that counsel for the Sanders family was aware the lienholder was subrogating and negotiating directly with SCA only, and that the lien had been negotiated to $150,000. Counsel also was aware that the lienholder had taken the position that the lien would be paid directly by SCA's insurer and not the Sanders family.

¶19 Given SCA had just rejected the Sanders' counteroffer of $425,000 ($300,000 directly paid to the four members of the Sanders family and $125,000 directly paid to the medical lien holder), it is disingenuous to argue a reasonable person would believe that SCA would then offer a settlement of $350,000 to cover the release of only one individual's claims. And it is not reasonable to believe the opposing side would be "throwing [them] a life raft" and extending a more favorable counteroffer for no apparent reason, as counsel for Sanders family argued.

¶20 "Clear, convincing and satisfactory proof is required before reformation of a contract will be granted." *Realty Exch. Corp. v. Cadillac Land & Dev. Co.*, 13 Ariz. App. 232, 236 (1970) (citation and internal quotation marks omitted). Here, the superior court granted reformation of the contract when it found that John, Robert, and Lori intended to resolve their

claims along with Coeta in one global settlement; that due to an error on Defendant's counsel's part their names were mistakenly omitted from the release document Coeta signed; and that Plaintiff's counsel, aware of the unilateral mistake, engaged in inequitable conduct which justified reformation of the contract to include John, Robert, and Lori. And the evidence supports the superior court's finding that the parties agreed to settle all claims for $350,000, which included satisfaction of all liens. Indeed, the Sanders family does not deny or dispute that showing. Sufficient evidence of unilateral mistake on the part of SCA's counsel and fraud or inequitable conduct on the part of Appellants exists to justify reformation of the contract to include John, Robert, and Lori and the superior court did not abuse its discretion in so finding.

## II. Extinguishment of Loss of Consortium Claims

¶21 John, Robert, and Lori also argue the superior court erred when it found that, because their loss of consortium claims are derivative of Coeta's claims, Coeta's pre-litigation release of her personal claims against SCA had the effect of extinguishing John, Robert, and Lori's claims.

¶22 "A child's claim for loss of consortium is derivative of the parent's claim for personal injuries." *Villareal v. Ariz. Dep't of Transp.*, 160 Ariz. 474, 481 (1989). "[T]he success of a loss-of-consortium claim is dependent on the success of another claim." *Martin v. Staheli*, 248 Ariz. 87, 92, ¶ 17 (App. 2019). A derivative claim for loss of consortium necessarily requires proof of each of the elements of the underlying cause of action. *Barnes v. Outlaw*, 192 Ariz. 283, 286, ¶ 8 (1998).

¶23 The loss of consortium claim alleged here is a derivative of any tort claim Coeta may have asserted against SCA. To prevail on a loss of consortium claim, Appellants must first prove each element of the premises liability claim they have alluded to in the complaint. But, in a pre-litigation settlement agreement, Coeta agreed to release SCA of all claims which she may have pursued against SCA on account of her trip and fall. Coeta's pre-litigation release of all claims necessarily means that there is no claim which she may advance against SCA. Then, if Coeta may no longer bring a successful claim against SCA, neither can anyone whose claim depended on the success of Coeta's claim.

¶24 Relying on *Villareal*, 160 Ariz. at 474, Appellants argue that "affirmative defenses, such as the running of the statute of limitations applicable to the primary claim, are only applicable to the loss of consortium claim if the defendant *joins* the two claims," and that "SCA's

7

asserted affirmative defense of satisfaction and release applicable to Coeta's claim could only be applicable to [Appellants] if SCA had joined [Appellants'] claims in the final written settlement agreement and release executed by Coeta alone." Appellants are incorrect.

¶25　　　　In *Villareal*, the Arizona Supreme Court explained that because children's minority tolls the statute of limitations, defendants generally may require joinder of their claims and if they fail to join the children, the normal statute of limitations rules will apply. *Id.* at 481. This discussion applies in the context of a civil action that has already been filed. In that case, joinder of plaintiffs in an action may be had when the persons seeking to join assert any right to relief jointly with the plaintiffs in the action. Rule 20(a)(1)(A). But in order to join in an action as a plaintiff, a cause of action must first exist. We have found no legal authority, and Appellants propose none, for the proposition that joinder principles apply to pre-litigation settlement agreements. In fact, in *Villareal*, the court noted that because their father's case had been settled, the Villareal children were not eligible to pursue their loss of consortium claims either. 160 Ariz. at 481. Like the Villareal children, because of Coeta's pre-litigation settlement, Appellants may no longer pursue their loss of consortium claims. Because no genuine issue as to any material fact exists, SCA was entitled to summary judgment.

## CONCLUSION

¶26　　　　For the foregoing reasons, we affirm. We deny Appellants' request for attorneys' fees and costs incurred on appeal.



AMY M. WOOD • Clerk of the Court
FILED: 　AA